The opinions of Whyte, Cateon, and Ckabb, JJ. (Pece, J. dissenting,) were delivered by
CRABB, J.
*498 One question made by the plaintiff in error is as to the caption of the indictment.
1. It is said to be insufficient, because.it does not there appear that the grand jurors were freeholders or householders. One answer to this objection is that it does appear. They are said to be good and lawful men; and to be so, they must be freeholders and householders.
2. Another answer is that it is not necessary that the qualifications of jurors should appear, even by the English [150] practice, in the case of proceedings. in the superior courts. 1 Chit. Crim. Law, 333; Hawk. P. C. ch. 2, § 17; Rex v. Darly, 4 East’s Rep. 175.
3. But it may be remarked, in this connection, that the reasons for favorable presumptions as to qualifications are much greater here than they are in England. There they depend for a judicious and legal selection of a jury on a single individual, a mere ministerial officer. Here the jurors are chosen by the County Court, a judicial tribunal of extensive jurisdiction.
This subject has received an attentive examination in all its bearings. The British cases, and all our own acts of Assembly, have been minutely examined. But it is unnecessary to do more here than to state the result of our inquiries.
Another objection has been thought worthy of consideration, particularly on account of the impression it has made on the mind of one of the members of the Court. It occurred to the judges in the consultation.
It appears from the caption that William E. Kennedy held the Court for the county of Davidson in the fourth judicial circuit, and he is judge of the sixth judicial circuit. It is thought that it should appear on the face of the caption, how the judge of the sixth circuit came to hold a Court in the fourth. A satisfactory answer to this objection, in the opinion of three members of the Court, is, that his authority to do so is found in a public law of the land. Without referring to any other act of Assembly, the Act of 1825 expressly required Judge Kennedy, as a judge of the sixth circuit, to hold this very Court.
It is also alleged that the Court erred in refusing to continue the cause at May term, 1826. The Circuit Court exercise a sound discretion on' the subject of continuances. They have a full view of the circumstances which ought to influence them in disposing of motions for that purpose ; but it is difficult to communicate those circumstances for the inspection of a court above. Although this Court, from its peculiar practice in this respect, revises what other tribunals do in relation to continuances, yet to induce it to [151] reverse a judgment on that account, it must clearly appear that the Court below erred. Instead of being thus satisfied that they improperly refused this continuance, enough appears to convince us that they acted correctly. It was a second motion for a continuance. It was founded upon the affidavit of the defendant alone. The only plausible ground laid *499 was the absence of a witness, living out of the State, whose absence had constituted one ground of the prior continuance. But what is of itself conclusive, that which was expected to be proved by the absent witness, was necessarily susceptible of proof by others, if true. He wanted him to show his previous good character and inoffensive conduct, except when he drank too much, which was attended or followed by derangement, &c. Can it be possible that such facts could be proved but by one absent man ?
But the objection which has been most earnestly pressed by the counsel for the plaintiff in error is to the admission of Lewis Carter’s testimony. It is urged that what M’Callahan said or did might be evidence against himself, but cannot against Cornwell. The counsel admit that acts of a person, first proved to be an accomplice, may be received as evidence against the defendant. But they deny that M’Callahan was in this case proved to be an accomplice; and they deny that what he said was, in the legal sense, a part of the act, so as to authorize it to be proved.
Reasoning is not necessary, at this day, to demonstrate that where two men are shown to have had a community of purpose, a unity of design with regard to a particular object, what one of them did in the pursuance of their plan towards the attainment of that object tends to explain their common motives and their joint movements. And this rule applies whether the act of one was done in the presence of the other or not. This sort of evidence is oftener needed in prosecutions for high treason, from the peculiar nature of that offence in all countries, especially in England. But it is constantly received in all cases where the principle applies. Phillips’s Ev. 73; East’s Cr. Law, 96. And it is immaterial whether they be civil or criminal cases, or criminal cases of one sort or another.' Swift’s Evidence, 155.
[152] Before Carter’s statement was offered some other testimony was introduced, with a view of showing, in technical language, a conspiracy between Cornwell and M’Callahan. It was previously proved that, about three months before the homicide of the deceased Hughes, M’Callahan and Cornwell met him in a house of ill fame; that they quarrelled and fought, the two latter being associated against the former. M’Callahan had struck Hughes and knocked him down, and Cornwell stamped upon him. M’Callahan and Hughes were proved to be together at the place where the homicide occurred ; Hughes and Cornwell quarrelled ; Hughes proposed to fight Cornwell the next morning; Cornwell and M’Callahan stepped a little back, and seemed to be conversing; Cornwell pulled M’Callahan’s hat off his head and put it on his own, and put his own hat on the head of M’Callahan ; then stepping up to Hughes, and asking him if he had said he would whip him or any of his friends, struck backwards with a small knife and killed him. The prisoner and M’Callahan left the spot together. The prisoner went to several places after the rash act was done; boasted everywhere that he had killed a man, and M’Callahan was constantly seen with *500 him. This Court are of opinion that there was abundant evidence to authorize the Court below to admit the acts of the latter to be heard by the jury on the trial of the prisoner. It cannot be expected that a witness will often be produced who can prove that he heard' two individuals agree together to do an unlawful act. This certainly is the most conclusive evidence of conspiracy. But it is scarcely more satisfactory than that produced on this occasion. Here are two men, friendly, intimate with each other, and having a common enmity against a third person. They are seen a shoitf; time before the melancholy catastrophe, making common cause in a quarrel, and even fight with that third person. They are found- on the night of the fatal deed, together at the spot. They talk together privately, exchange hats; one commits homicide, the other stands by and abets him ; and, after the act is committed, which would fill every well-regulated mind with horror, he stands by his friend, and listens without [153] disapprobation to his boasts of what he had done. M’Callahan may not have been an accomplice, and we hope he was not, for it is said he was acquitted by a jury. But the Court below were well warranted by the evidence on this record in so considering him, for the purpose of admitting the proof in question. It must be remembered that the fact of conspiracy, like other facts, may be established by circumstantial testimony. M’Nally, 633; East’s Cr. Law, 96; Swift’s Evidence, 156.
The evidence of another’s acts may be obviated after his introduction by counter proof, or it may be disbelieved by the jury. Its effect is left with them by the judge. They know and were, or would have been, upon request, told by the judge, in this as in other cases, that they were the exclusive judges of the question of fact. If the Court below had perceived, after hearing the whole case, that, contrary to his expectation, the evidence in question had tended to fix the guilt of another upon the prisoner, with whom he was connected, he ought to have granted a new trial. He did not think so, nor does this Court. If a doubt was left on the mind as to the two being accomplices, it at once vanishes before this evidence of Carter. Carter tells us, in substance, that only about two hours before the homicide these men came to his shop together. M’Callahan asked witness if he had seen the deceased, and called for ardent spirits. M’Callahan and Cornwell touched glasses and drank. M’Callahan said there was but one man that he had any animosity against, and struck his knife several times into the baluster, and said if he caught him that night he would give him first hell, then said to Cornwell, “ Let us go.” Why did they go to this shop together ? Why does one buy spirits for both to drink, with all the evidences of intimacy ? Why does one ask for Hughes, and the other express no curiosity to know what he wanted with him? no surprise at his inquiring for the very man with whom they had jointly fought a short time before? Why no questions asked as to the person intended, and no appro *501 bation or disapprobation expressed when the vengeful threat was made that was to go into effect that night ? Why, when it was made, did they [154:] leave the shop together ? Combine, then, the previous quarrel and fight and what soon followed, and you have a mass of evidence of conspiracy that is irresistible.
But it is objected that what M’Callahan said is not evidence, if what he did be so considered. The answer is, that his inquiry, his threat, are a part of the act. They accompany, they explain it. It is a great mistake to suppose that the res gesta, in the legal sense, is, in a case of murder, confined to the fact of thrusting the knife into the body, and thereby depriving of life. The res gesta is the murder, and the murder is made up of the homicide and the intent with which it was committed. Actions, therefore, which serve to demonstrate the quo animo, are a part of the res gesta. And words which are a part of those actions are admissible. No instance is known where the words of an accomplice, under such circumstances, have been rejected; words spoken in the presence of the person charged, the guilt of which would be more or less affixed to him by the jury according to all the evidence in the case.
Difficulties, as to the acts and declarations of an accomplice, being proved, have usually arisen where they occurred in the absence of the person on trial.
But it is said that the quarrel at the house of ill fame had been adjusted. It is a sufficient answer to this suggestion, that no evidence of this kind had been offered to the judge when he heard Carter’s testimony, and when the jury had heard the whole of it they doubtless did not believe that there had been a sincere reconciliation.
It is believed to be very clear that the Court committed no error by receiving Carter’s testimony.
It is also contended that the Court below erred in their charge to the jury, and in refusing to charge as requested. The bill of exceptions presents us with what the judge said, as follows: “The Court, in charging the jury, after defining the crime of murder, stated that the fact of .killing being proved, the law presumes malice; and it lies on the defendant to show, from proof, circumstances of excuse or alleviation, unless they otherwise appear. Malice is express or implied ; and, when there is no previous grudge it is implied [155] when one kills another with a deadly weapon, not having been previously assaulted, in which case it is murder; you will inquire whether there was express malice, or whether there was a previous assault. If, at the time, he had not sufficient understanding to know right from wrong, and was in a state of insanity, it would be an excuse; but that must be proved. But if his insanity or unusual bad conduct arose from drunkenness, it is no excuse. There may be cases where insanity is produced by long-continued habits of intoxication, but it must be a perma *502 nent insanity. Insanity which is the immediate effect of intoxication is no excuse; he is equally responsible for all his acts. The counsel for the prisoner requested the Court to charge the jury, if they believed, from all the circumstances of the case, that the defendant at the time of the slaying labored under a temporary suspension of reason, and was insane, although intoxication might have been the exciting cause, it is a circumstance of mitigation or excuse; and more especially, if intoxication were not intended at the time of drinking, but the same were accidental, or'a consequence'not intended or apprehended. But the Court would not so charge, but said insanity thus produced was no excuse.”
. Three cases of conviction for murder have been brought before this Court at the present term; in two of which, the prisoner was defended,-in the Court below, on the ground of madness, occasioned by drunkenness; and yet in neither does it seem to us was there a colorable foundation for such a defence. This Court would be remiss in the performance of their duty if • they did not, under these circumstances, declare the law explicitly oh this most important subject. In the argument of these causes very untenable positions have .been assumed, and very dangerous doctrines have been advanced by counsel. And from what was stated by some of those counsel, these doctrines have been repeatedly urged, and sometimes sanctioned in the courts below.
It has become fashionable of late to discourse and philosophize much on mental sanity and insanity. New theories have been broached, and various grades and species of mania have been indicated. Some reasoners have gone so [156] far as to maintain that we are all partial maniacs. Whatever differences of opinion there may be as to the construction and operations of the mind of man, whatever difficulty in discovering the various degrees of unsoundness, it is only necessary for us to ascertain the kind of prostration of intellect which is requisite to free a man from punishment for crime by the law of the land. It is with this alone we have to do. “ What the law has said, we say. In all things else we are silent. We put our feet in the-tracks of our forefathers; — Non meus Me sermo, sed quce prcecepit Offellus. Let us then for a moment resort to the sages of the law of different ages, and learn from them whether that species of frenzy which is produced by inebriety constitutes any excuse for crime, and what sort of insanity it is which will serve this purpose ?'
The good and the great, the humane yet firm, Sir Matthew Hale, in his history of the Pleas of the Crown, divides madness (dementia) into three kinds, — idiocy, accidental or adventitious madness, and drunkenness. “ The second species, when it amounts to a total alienation of the mind, or perfect madness, excuses from the guilt of felony and treason. And further, persons afflicted with accidental madness, whether temporary (as in the case of lunacy) or continued, if they are totally deprived of the use of rea *503 son, cannot be guilty ordinarily of capital offences; for they have not the. use of understanding, and act not as reasonable creatures, but their actions are, in effect, in the condition of brutes.” (Page 30.)
“ The third sort of gladness is that which is dementia affeclata, namely, drunkenness. This vice doth deprive man of the use of reason, and puts many men into a perfect but temporary frenzy; but by the laws of England such a person shall have no privilege by this voluntarily contracted madness, but shall have the- same judgment as if he were in his right senses.”
In the case of Reniger v. Fogossa, in Plowden 19, we have a rule laid down, which has been approved again and again, from the early day in which it was advanced to the present time, “ that if a person that is drunk kills another, this shall [157] be felony, and he shall be hanged for it; and yet he did it through ignorance, for when he was drunk he had no understanding or memory; but, inasmuch as that ignorance was occasioned by his own act and folly, and he might have avoided it, he shall not be privileged thereby.” Here we have the strongest case put; a case of a total deprivation' of understanding by drunkenness. Yet it is held to form no excuse.
Lord Coke, in his Commentaries, p. 247, A. says: “ As for a drunkard, who is voluntarius dcemon, he hath ho privilege thereby ; but what hurt or ill soever he doth, his drunkenness doth aggravate it.” And we are told in Beverly’s case, 4 Rep. 125, “ that although he who is drunk is for the time non compos mentis, yet his drunkenness doth not extenuate his act or offence, nor turn to his avail.”
Hawkins, in his Pleas of the Crown, b. 1, ch. 1, § 6, says, ‘ that he who is guilty of any crime whatever through his voluntary drunkenness shall be punished for it as much as if he had been sober.” The erudite commentator on the laws of England writes as follows on this subject (4 Black. ch.,25, 26) : “ As to artificial, voluntarily contracted madness, by drunkenness or intoxication, which, depriving men of their reason, puts them in a temporary frenzy, our law looks Upon this as aggravation of the offence rather than as an excuse for any criminal misbehavior. The law, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, though real, will not suffer any man thus to privilege one crime by another.”
But the part of the judge’s charge which is most earnestly objected to - is in the following words: “ There may be cases where insanity is produced by long-continued habits of intoxication, but it must be a permanent insanity.”
It has been already stated by us that madness, or insanity if the term be preferred, occasioned immediately by drunkenness does not excuse. Yet the judge correctly says, “ that if, by means of drunkenness, a permanent, *504 or, as Lord Hale to the same effect expressed it, an habitual or fixed madness be caused, that it will excuse.” See H. H. P. C. pt. 1, ch. 4.
[158] In the above extracts we see the law in this respect. A contrary doctrine ought to be frowned out of circulation, if it has obtained it, by every friend to virtue, peace, quietness, and good government. The history of criminals and criminal trials shows that he who has not learned betimes to restrain the evil inclinations of our nature, — envy, malice, revenge, and their kindred passions, — but has a sufficiency of moral sense left to deter him from the commission of enormity while sober, will often “ screw his courage to the sticking-point ” by the free use of ardent spirits, and, thus made able to silence the twinges of his conscience, will voluntarily imitate the demon. But let courts once approve.the doctrine now contended for, and it will not be resorted to as a plea by persons of this description alone ; but even the cold-blooded, calculating assassin will never be a sober homicide; he will always exhibit himself at the bar of a court of justice as a specimen of insanity produced by drunkenness. And thus this degrading and disgraceful yet too common vice, instead of being hunted from society as the bane of good morals and social and domestic happiness, will be converted into a shield to protect from punishment the worst of crimes. All civilized governments must punish the culprit who relies on so untenable a defence; and in doing so they preach a louden lesson of morality to all those who are addicted to intoxication, and to parents, and to guardians, and to youth, and to society, than “ comes in the cold abstract from pulpits.”
In order to be clearly understood, we have supposed the strongest case, — a case of entire prostration of intellect immediately occasioned by drunkenness, and have said that that constitutes no excuse. Instances, however, of heinous offences, committed under such circumstances, are believed to be of rare occurrence. They are much oftener the result of that midway state of intoxication which, although sufficient to stimulate the evil-disposed to actions correspondent with their feelings, would not excite the good man to criminal deeds. It is generally the drunken man acting out the sober man’s intent. He says and does when drunk what he thinks when sober.
[159] This Court entirely concur with the Circuit Court in the charge given to the jury.
Parts of this opinion may appear to partake of the character of a moral lecture. It is believed to be called for by the occasion. We have seen before us this day three fellow-beings who are about to be ushered into the presence of their Maker, two of whom may probably attribute his unnatural exit from this world to the immoderate use of ardent spirits. Disagreeable as it is, the solemn duty is devolved upon the Court of pronouncing, in this instance also, the sentence of the law that the judgment of the Circuit Court be affirmed.